**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATIONAL STEEL AND SHIPBUILDING COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>CENTURY INDEMNITY COMPANY,<br><br>Defendant. | CASE NO. 12-cv-1147-MMA-MDD<br>**ORDER:**<br>**DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>[Doc. No. 22]<br>**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br>[Doc. No. 21] |

Currently pending before the Court is Plaintiff National Steel and Shipbuilding Company's ("NASSCO") motion for partial summary judgment [Doc. No. 22], and Defendant Century Indemnity Company's ("Century") motion for summary judgment [Doc. No. 21]. The parties each filed oppositions and replies to the respective motions. [*See* Doc. Nos. 24, 27, 31, 33.] For the reasons set forth below, the Court **DENIES** Plaintiff's motion for partial summary judgment, and **GRANTS** Defendant's motion for summary judgment.

## BACKGROUND

NASSCO's claim against Century arises from assessments levied against NASSCO pursuant to the Longshore and Harbor Workers' Compensation Act ("Longshore Act" or "Act"), 33 U.S.C. §§ 901 *et seq.* A brief review of the Longshore Act is in order.

**A.    The Longshore Act**

The Longshore Act established a federal worker's compensation system for employees disabled in the course of maritime employment. Employers subject to the Longshore Act are required to secure the payment of compensation either by self-insuring their liability or by purchasing authorized workers' compensation insurance for that exposure. 33 U.S.C. § 932. Generally, the Act requires employers or their insurers to pay all disability compensation owed to an injured employee.

However, employers and their insurers are relieved of direct payment obligations by the Longshore Act's "Special Fund," which provides payments to injured workers for covered injuries. *See* 33 U.S.C. §§ 8(f), 944(a). For example, where a pre-existing condition contributes to an employee's post-injury permanent disability (referred to as a "second injury"), section 8(f) of the Longshore Act limits an employer's liability for post-injury permanent disability payments to 104 weeks. *Pac. Ship Repair and Fabrication, Inc. v. Dir., Office of Worker Comp. Prog.*, 687 F.3d 1182, 1185 (9th Cir. 2012) (citing 33 U.S.C. § 908(f)).[1] Thereafter, an industry-financed "Special Fund" pays the remaining permanent disability benefits due. 33 U.S.C. § 944(a). "Section 8(f) was intended to encourage employers to hire disabled workers and permits such employers to distribute among all employers subject to the Act, must of the cost of compensating such a worker should the

---

[1] "To qualify for § 8(f) relief, the employer bears the burden of establishing that (1) the claimant had an existing permanent partial disability prior to the employment injury, (2) the disability was manifest to the employer prior to the employment injury, and (3) the current disability is not due solely to the most recent injury." *Marine Power & Equip. v. Department of Labor*, 203 F.3d 664, 668 (9th Cir. 2000) (citing *Director, OWCP v. Cargill, Inc.*, 709 F.2d 616, 619 (9th Cir. 1983)).

worker suffer a subsequent 'injury.'" H.R. Rep. 98-570(I).

### 1. Special Fund Financing

From enactment of the Longshore Act in 1927 until 1972, the Special Fund was financed through (1) payments by employers or insurance carriers in death cases with no eligible survivor; (2) fines and penalties levied under the Act; and (3) any investment income on the unused balance in the Fund. 33 U.S.C. § 944(c), (d) (1927). In 1972, along with other fundamental changes to the Act, Congress amended section 44 of the Act to increase Special Fund revenue. Most significantly, Congress instituted an annual assessment system against insurers and self-insurers. "Each carrier's or self-insurer's assessment was calculated based upon its share of direct indemnity and medical payments paid in the prior year, divided by the total of direct indemnity and medical payments made by all payers under the Act during the preceding calendar year, multiplied by the amount projected to be needed by the Fund for the current calendar year." Warns & Feinhalter, *Partial Relief From Liability Under Section 8(f) of the Longshore Act*, 11 Loy. Mar. L.J. 83, 90 (Fall 2012). Absent from this formula, however, was any correlation between the annual assessment and the number of disabled employees an employer had in the Fund. *See id.* Thus, employers could place any number of employees in the Special Fund and suffer no consequence to their Special Fund assessment the following year. Consequently, utilization of the Special Fund burgeoned uncontrollably, and Fund disbursements grew from $3,035,000 in 1976 to approximately $23,622,000 in 1982. H.R. Rep. 98-570(I), 20.

To combat the unrestrained growth of the Special Fund's obligations, Congress determined to "increase the employers' financial stake in claims which present potential Special Fund obligations." H.R. Rep. 98-570(I), 20. Consequently, as part of the 1984 amendments to the Act, Congress revised the formula for financing the Fund to include a Special Fund "usage factor." The resulting formula, which remains in effect today, is based upon three factors: (1) the

employer's share of workers' compensation payments in the preceding calendar year; (2) the share of Section 8(f) costs attributable to the employer during the preceding calendar year, and (3) the total needs of the Fund for the current calendar year. 33 U.S.C. § 944. Thus, the 1984 amendments created a direct correlation between Special Fund benefits paid to an employer's injured workers during one year and that employer's Special Fund assessment the subsequent year.

In effect, "[t]he Special Fund assesses back against the carrier or self-insured employer approximately 70% of compensation paid by the Special Fund under Section 908(f). Stated another way, the Second Injury Fund Relief results in a savings, hypothetically, of 25% to 30% to the employer/carrier of compensation paid more than 104 weeks after the date of maximum medical improvement." Warns, *Barriers to Settlement: The Phantom Partners At The Settlement Table And What To Do With Them*, 10 Loy. Mar. L.J. 367, 386-87 (Spring 2012).

### B. Factual Background[2]

NASSCO designs, builds, and repairs ships for government and commercial customers. It is subject to the Longshore Act, and elected to be a self-insurer under the Act. Between 1974 and 1977, to offset its potential liability under the Act, NASSCO purchased three annual excess insurance policies from Century's predecessor, Cal-Union Insurance Company.[3] Specifically, for the policy period of October 1, 1976, to October 1, 1977, Century issued to NASSCO an Excess Workmen's Compensation and Employers' Liability Policy (the "Policy"), which carried a limit of "$500,000, ultimate net loss, in excess of a retained limit of $250,000." [Pl's Mot., Ex. A at 1.]

During the Policy period, NASSCO employees Samuel Pagano, Jr. and Mikel Fonce suffered work-related injuries which entitled them to receive workers'

---

[2] The facts cited herein are taken from the parties' separate statements of fact [Doc. Nos. 21-3, 22-2] and are not in dispute.

[3] Referred to herein as "Century."

compensation benefits. Because Pagano and Fonce were second injury cases, NASSCO was only responsible to pay the first 104 weeks of disability benefits, after which the Special Fund assumed responsibility for the payments.

Between 1977 and 2012, NASSCO directly paid $105,597.26 in disability, medical, and other workers' compensation benefits to Pagano. Further, NASSCO asserts that, as a result of the 1984 amendments to the Longshore act, it paid a total of $283,455.00 in "increased assessments"[4] to the Fund as a direct result of Pagano's injuries between 1985 and 2012. With respect to Fonce, between 1977 and 2012, NASSCO directly paid $65,871.83 in disability, medical and other workers' compensation benefits to him. In addition, NASSCO asserts that, between 1985 and 2012, it paid a total of $334,769 in increased assessments to the Special Fund because of Fonce's injuries.

On April 16 and 17, 2009, NASSCO submitted claims to Century for reimbursement of the amounts paid by NASSCO in connection with Pagano and Fonce's workers' compensation benefits. Century denied both claims, explaining that "any obligation for the *Pagano* and *Fonce* matters under the Excess Policy exist only with respect to 'compensation and other benefits' required of NASSCO under the workers' compensation law. As such, the Excess Policy does not respond to administrative expenses, such as [Special Fund] assessments, incurred by NASSCO as a self-insured employer." [NASSCO Mot., Doc. No. 22, Ex. P, at 2.] Subtracting the Special Fund assessments from Pagano and Fonce's claims, Century found that neither case reached the $250,000 retained limit as required by the Policy.

This action followed. In its complaint, NASSCO asserts the following claims: (1) Breach of Contract (Duty to Indemnify); (2) Breach of Implied Covenant of Good Faith and Fair Dealing; and (3) Declaratory Judgment.

---

[4] NASSCO coins the term "increased assessment," and defines it as "the amount of an employer's annual Special Fund assessment that is directly correlated to Special Fund benefits paid to that employer's 'second injury' workers." [NASSCO Mot. at 6 n. 8.] NASSCO asserts that, given the methodology of the 1984 formula, it is possible to calculate precisely the increased assessment an employer will owe because of Special Fund benefits paid to any one of its injured workers. [*Id.* at 6.]

Century moves for summary judgment as to all of NASSCO's claims on grounds that the Policy does not provide coverage for Special Fund assessments. NASSCO moves for partial summary judgment on same specific issue. While a ruling in Century's favor would foreclose the entirety of NASSCO's claims, one in NASSCO's favor would not ensure Century's ultimate liability.

## APPLICABLE LAW

### A. Federal Rule of Civil Procedure 56

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Id.* at 323. The evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986). When a party fails to properly address another party's assertions of fact, a court may consider these facts as undisputed. Fed. R. Civ. P. 56(e)(2). If the motion and supporting materials, including facts considered undisputed, show the movant is entitled to summary judgment, the Court may grant the motion. Fed. R. Civ. P. 56(e)(3). Summary judgment is not appropriate if the non-moving party presents

evidence from which a reasonable jury could resolve the disputed issue of material fact in his or her favor. *Anderson*, 477 U.S. at 248; *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir.1991). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## DISCUSSION

The cornerstone of NASSCO's insurance claim is the correlation established by the 1984 formula between the amount of Special Fund benefits that are paid to Pagano and Fonce in any given year, and NASSCO's Special Fund assessment for the following year. Between 1985 and 2012, NASSCO has paid increased assessments into the Special Fund of $283,455 directly attributable to the injuries sustained by Pagano, and $334,769 directly attributable to the injuries sustained by Fonce. NASSCO contends that these costs qualify for coverage under the Policy. Century disagrees. Thus, the ultimate question before the Court is whether language in the Policy provides coverage for yearly assessments paid into the Special Fund.

### A. Principles of Insurance Policy Interpretation

Interpretation of an insurance contract is a question of law. "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the W. v. Superior Court*, 2 Cal.4th 1254, 1264 (1992). "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Id.* Such intent is to be inferred, if possible, from the written provisions of the contract based on their "ordinary and popular sense," unless a "technical sense or special meaning is given to them by their usage." *Id.* at 647-48 (citing Cal. Civ. Code §§ 1639, 1644, 1638). If the contractual language is clear and explicit, it governs. *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 822 (1990).

The terms in an insurance policy must be read in context and in reference to the policy as a whole, with each clause helping to interpret the other. Cal. Civ. Code

§ 1641; *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 867 (1993); *Palmer v. Truck Ins. Exch.*, 21 Cal.4th 1109, 1115 (1999). Accordingly, a provision is ambiguous "*only* if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole." *Palmer*, 21 Cal.4th at 1115 (emphasis in original); *see also Bank of the W.*, 2 Cal.4th at 1265 ("[L]anguage in a contract must be construed in the context of the instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.") (quotation omitted). A court faced with an argument for coverage based on an assertedly ambiguous policy language "must first attempt to determine whether coverage is consistent with the insured's reasonable expectations," and "[i]n so doing . . . must interpret the language in context, with regard to its intended function in the policy." *Bank of the W.*, 2 Cal.4th at 1265. Thus, although unresolved ambiguities in insurance policies are generally construed against the insurer, *AIU Ins. Co.*, 51 Cal.3d at 822, that principle only applies if the meaning of a term is ambiguous in light of the policy as a whole, and if coverage is within the objectively reasonable expectations of the insured. *Bank of the W.*, 2 Cal.4th at 1265.

**B.     Coverage of Special Fund Assessments Under the Policy**

As "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties[,]" *Bank of the W.*, 2 Cal.4th at 1264, the Court considers whether the parties intended the Policy to provide coverage for Special Fund assessments. The relevant provisions of the policy provide:

<u>INSURING AGREEMENTS</u>

I.     Workmen's Compensation and Employers' Liability

[Century] hereby agrees to indemnify [NASSCO] against excess loss as a result of injury (1) by accident occurring during the policy period, . . . subject to the limitations, conditions and other terms of this policy, which [NASSCO] may sustain because of:

(a)     compensation and other benefits required of [NASSCO] by

- 8 -

12-cv-1147

the Workmen's Compensation Law;[5]

    B.    [. . .]

II.    Limit of Liability - Retained Limit

[Century's] limit of liability under this policy shall be only for the *ultimate net loss* in excess of [NASSCO's] retained limit stated in the declarations and then only for an amount not exceeding the policy limit stated in the declarations;

[. . .]

CONDITIONS

[. . .]

    D.    <u>Definitions</u>

        [. . .]

        F.    Ultimate Net Loss. The term "ultimate net loss", as used in this policy, means the sum actually paid in cash in the settlement or satisfaction of losses for which the Insured is liable, either by adjudication or compromise with the written consent of [Century], after making proper deductions for all recoveries . . . . Other loss and legal expenses (including court costs and interest on any judgment or award) incurred with the consent of Century shall be apportioned in proportion to the respective interests as finally determined.

[Policy at 4, 7.]

    NASSCO traces the language in Paragraph I of the Policy and argues that Special Fund assessments are covered by the Policy because they: (1) constitute loss, (2) incurred as a result of injuries occurring during the policy period, (3) because of compensation and other benefits required of NASSCO by the Longshore Act. [NASSCO Mot. at 11, Doc. No. 22, (citing Policy at 4).] Century argues that this three-step inquiry is improper because NASSCO reads Paragraph I in isolation rather than in context with the entire Policy. [*See* Century Mot. at 4-15, Doc. No. 21.]

    The Court agrees that Paragraph I may not be read in isolation: "The whole of

---

[5] The Policy defines "Workmen's Compensation Law" to include the Longshore Act. [*See* Pl's Mot., Ex. A at 6.]

a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. Thus, rather than adopt NASSCO's three-step inquiry–which isolates Paragraph I of the Policy–the Court will start anew with its own analysis of whether the Policy covers the increased assessments.

### 1. Excess Loss v. Ultimate Net Loss

First, the Court considers whether the Policy covers *any* excess loss incurred by an accident during the policy period, or only losses which qualify as an "ultimate net loss." At first blush, the Policy is ambiguous on this point. The source of the confusion stems from Paragraph I of the Policy (the "central insuring provision"), which states that Century agrees to "indemnify [NASSCO] against *excess loss* as a result of injury . . . ." [Policy at 4.] However, Paragraph II (the "limit of liability provision") provides that Century's "limit of liability under [the Policy] shall be only for the *ultimate net loss* in excess" of NASSCO's retained limit. [*Id.* (emphasis added).]

NASSCO contends that the reference to "ultimate net loss" in Paragraph II is not designed to narrow the "excess loss" language of Paragraph I. [NASSCO Reply at 2-3.] NASSCO cites a California Supreme Court for the proposition that an "ultimate net loss definition referenced in the 'limits of liability' provision of a policy, but not in the policy's central insuring provision, cannot be used to expand an insurer's indemnification obligation." [NASSCO Reply at 3 (citing *County of San Diego v. Ace Property & Casualty Ins. Co.*, 37 Cal.4th 406, 419-20 (2005).]

*Ace* is distinguishable. There, the central insuring provision of the policy required the insurer to indemnify the insured "for all sums which the insured is obligated to pay by reason of liability imposed by law or assumed under contract or agreement arising from '*damages*' resulting from the destruction or loss of use of tangible property." *Ace*, 37 Cal.4th at 411 (emphasis added). "Damages" was the sole term of limitation in the central insuring provision, and the term "ultimate net

loss" appeared only in the policy's limits of liability section. *Id.* at 417, 420.

Here, however, a broad term of limitation appears directly in the central insuring provision: "[Century] hereby agrees to indemnify [NASSCO] against excess loss as a result of injury (1) by accident occurring during the policy period . . . *subject to the limitations, conditions, and other terms of this policy*[.]" [Policy at 4 (emphasis added).] Thus, unlike in *Ace*, the central insuring provision specifically mentions that later provisions would limit Century's contractual obligation.

One such limitation appears in Paragraph II, which states that Century's "limit of liability under this policy shall be only for the *ultimate net loss* in excess of [NASSCO's] retained limit . . . ." This limitation aligns with the description of the coverage found on the Policy's cover page: "LIMIT: $500,000, *ultimate net loss*, in excess of Insured Retained Limit of $250,000." [Policy at 1.] When reading the Policy as a whole, it is apparent that the Policy covers only "ultimate net loss." Thus, there is no ambiguity to resolve in favor of the insured. *See Bank of the W.*, 2 Cal.4th at 1265.

### 2. Coverage of Assessments as "Ultimate Net Loss"

Next, the Court considers whether the Special Fund assessments qualify as "ultimate net loss." As pertinent here, the Policy defines "ultimate net loss" to mean "the sum actually paid in cash in the settlement or satisfaction of losses for which [NASSCO] is liable . . . by adjudication[.]" [Policy at 7.]

Century argues that the assessments cannot be "ultimate net loss" because they are not sums actually paid in settlement or satisfaction of losses for which NASSCO is liable by adjudication. "They are instead administrative expenses charged to NASSCO as an approved self-insurer for the [Longshore Act's] Special Fund." [Century Mot. at 8.] NASSCO, on the contrary, asserts that the assessments qualify as "ultimate net loss" because the administrative orders with respect to Pagano and Fonce expressly ordered that NASSCO was to pay permanent total disability compensation for 104 weeks, and that the Special Fund was to pay any

further disability payments. [NASSCO Reply at 4.] According to NASSCO, "[a]s a direct legal consequence of this *adjudication*, NASSCO has, since 1984, been required to pay 'increased assessments' to the Special Fund directly correlated to Special Fund benefits paid to both Pagano and Fonce." [*Id.* (emphasis added) (citing *National Metal & Steel Corp. v. Reich*, 858 F. Supp. 62, 66 (D. Md. 1994).]

*National Metal* is not on point. There, the employer, National Metal, rescinded its authorization to self-insure under the Longshore Act because it no longer employed maritime workers. Nonetheless, National Metal continued to receive Special Fund assessments. Consequently, National Metal brought suit, claiming it should not have to pay the yearly assessments. The district court disagreed, finding that an employer's obligation to compensate maritime employees for job-related injuries continues after it has terminated its business whether that compensation flows directly from the employer or from the Special Fund. *National Metal & Steel Corp. v. Reich*, 858 F. Supp. 62, 62 (D. Md. 1994). The Fourth Circuit affirmed, adopting the defendant's position that "termination of the authorization to self-insure ends only the employer's privilege of currently operating as a self-insurer, but has no effect on liabilities arising out of previous maritime employment." *National Metal and Steel Corp. v. Reich*, 55 F.3d 967, 969 (4th Cir. 1995). Otherwise, because of the Special Fund's structure, National Metal would "reap a benefit for which it bore no commensurate burden." *Id.* at 970.

*National Metal* does not transform NASSCO's assessments into "ultimate net loss" as defined by the Policy. Rather, *National Metal* stands solely for the unremarkable proposition that an employee subject to the Longshore Act cannot escape Special Fund assessments by closing its maritime division.

The Court finds Century's position regarding whether the assessments qualify as "ultimate net loss" to be more accurate. The Special Fund assessments are not levied on NASSCO as a result of the administrative law judges' orders granting Pagano and Fonce disability payments. Indeed, these orders make no mention of

any yearly assessment to be paid by NASSCO. [*See* NASSCO Mot. Exs. D, I.] Rather, the assessments at issue are levied on NASSCO because it is a maritime employer subject to the Longshore Act, and elected to be a self-insurer under the Act. The assessments are determined yearly by the Secretary of Labor based on the formula established by section 44 of the Act. *See* 33 U.S.C. § 944. That NASSCO only requests assessments from post-1984 further demonstrates that the assessments do not arise from the administrative orders; they instead arise as a result of the 1984 formula change. The Court finds that the assessments did not become due as a result of NASSCO's adjudicated liability in regard to the injuries sustained by Pagano and Fonce.

### 3. "Compensation" or "Other Benefits" Required by the Longshore Act

Another requirement of the Policy is that the "ultimate loss" sustained be from "compensation and other benefits" required of NASSCO by the Longshore Act. [Policy at 4.] The Longshore Act defines "compensation" as "the money allowance payable to an employee or to his dependents as provided for in this chapter . . . ." 33 U.S.C. § 902(12).

Century argues that the Special Fund assessments do not constitute "compensation" or "other benefits" required of NASSCO. [*See* Policy § I(a).] Century argues that the Special Fund assessments fail to implicate "compensation" because they are paid into the U.S. Treasury. According to Century, the assessments are neither earmarked for, nor are they assigned to, any specific purpose of the Special Fund, but are undifferentiated payments to the general fund. [*Id.*] Century argues that the assessments are properly viewed as an administrative expense.

NASSCO claims that the increased assessments are "compensation and other benefits" because they are owed as a direct consequence of the injuries Pagano and Fonce sustained, and because they are directly correlated to the benefits Pagano and Fonce receive from the Special Fund. [NASSCO Opp. at 5.] NASSCO asserts that,

as a result of the 1984 amendments, employers are, in effect, "billed-back" a portion of the Special Fund benefits paid to their employers in the previous year. [*Id.*] NASSCO further argues that nothing in the Policy requires that "compensation and other benefits be paid *directly* to the injured employees as a condition of coverage." [NASSCO Mot. at 15.] NASSCO cites an appellate decision from Ohio to support this proposition. [*Id.* (citing *Employers Reinsurance Corp. v. Worthington Custom Plastics, Inc.*, 109 Ohio App.3d 550 (1996)).]

However, *Employers Reinsurance* involved Ohio's Disabled Workers' Relief Fund ("DWRF"), a vastly different workers' compensation scheme from the Special Fund. The DWRF requires self-insured employers to directly compensate Ohio's Bureau of Workers' Compensation dollar-for-dollar for all amounts paid to qualifying employees. In *Employers Reinsurance*, the court found that the employer could recoup its DWFR payments from its insurance provider under a contract that required indemnification for "loss sustained . . . because of liability imposed upon [the employer] by the workmen's compensation act of Ohio on account of personal injuries . . . ." *Id.* at 556 (internal formatting omitted). The court reasoned that "[a]lthough the DWRF payments made by defendants since August 22, 1986 have been sent to the bureau rather than directly to defendants' eligible employees, it is undisputed that the payments made to the bureau are specifically attributable to the individual workers' compensation claims of defendants' former employees and are in an amount exactly equal to that received by those employees from the bureau. *In short, the bureau merely acts as a clearinghouse for the DWRF payments*." *Id.* at 556.

Here, unlike the DWRF, the Special Fund is not merely a "clearinghouse" for self-insured employers' payments as assessments are not dollar-for-dollar reimbursements of amounts paid out of the Fund. Rather, yearly assessments are based on a complex formula, and are designed to cover a wide variety of costs. *See* 33 U.S.C. § 944. The differences between Ohio's DWRF and the Longshore Act's

Special Fund are too substantial for *Employers Reinsurance* to be persuasive here.

Neither is NASSCO's analysis of *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807 (1990), persuasive. There, the Supreme Court of California considered whether, under a comprehensive general liability (CGL) insurance policy issued to FMC Corporation (FMC), the insurers were obligated to provide coverage to FMC for cleanup and other "response" costs incurred pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, and related state and federal environmental laws. The Court held

> to the effect that the duty to indemnify may embrace all money ordered by a court, including money that the insured must give under law as compensation to third parties and also money that the insured must itself expend in equity in order to provide relief of the same sort. We did not hold that the duty extends to any money in addition to that ordered by a court—including any expenses required by an administrative agency pursuant to an environmental statute. Indeed, we did not even consider the issue.

*Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal.4th 945, 966 (2001)(internal quotations and citations omitted). Here, as discussed above, the yearly assessments are not required by a court order, rather, they are expenses required by an government agency pursuant to the Longshore Act's Special Fund provision.

Century cites *Roman Catholic Diocese of Rockville Ctr. v. Certain Underwriters at Lloyd's London*, 875 N.Y.S.2d 823, 2008 WL 5046415 (N.Y. Sup. Ct. 2008), *aff'd* 72 A.D.3d 1057 (N.Y. App. Div. 2010), in support of the proposition that an assessment similar to that provided by the Act's Special Fund is an administrative expense, not loss related to injury.

There, the Diocese obtained a series of excess insurance policies from Lloyd's. The policy limits of liability provided for a self-retention by the Diocese up to a certain designated amount. During the covered period, the Diocese, as a self insurer, was required to pay assessments into New York's Workers' Compensation Board. The Diocese sought to recover these assessments from Lloyd's.

The policy provided that Lloyd's would pay "all compensation and other benefits required of the Assured by the workers' compensation law as a result of injury . . . or disease . . . ." *Id.* During the covered period, the Diocese was required to pay assessments used to support, *inter alia*, the Special Disability Fund, "the purpose of which [was] to encourage employers to hire disabled individuals who would otherwise have difficulty securing employment." *Id.* at *2. The Special Disability Fund accomplished this purpose by reimbursing "employers or their insurance carriers for a portion of the payments made to a previously handicapped individual in the event of a subsequent employment-related injury, disease or death. *Id.* The individual assessments for the Special Disability Fund were allocated to self-insurers and the state insurance fund "based upon the proportion that the total compensation payments made by all self-insurers . . . and the state insurance fund bore to the total compensation payments made by all self-insurers, the state insurance fund, all insurance carriers and group carriers. *Id.*

The question before the Court was "whether the coverage provisions of the applicable [excess insurance policies] require[d] payment of the[] statutorily mandated assessments to the Diocese by Lloyd's." *Id.* at *5. The Court concluded that the assessments were not covered by the policies. *Id.* The Court reasoned that the assessments imposed upon the Diocese as a self-insurer could not reasonably fall within a fair reading of the insurance policy. "The language of the policy is clear and unambiguous, it requires Lloyd's to reimburse the Diocese for financial loss caused by personal injuries, disease or death incurred by employees in the course of their employment. *It does not require payment of the administrative costs of being a self-insurer.*" *Id.* (emphasis added).

NASSCO questions *Roman Catholic Diocese*'s conclusion that the assessments were "administrative costs," stating that the court "did not offer any meaningful analysis in support of this conclusion." [NASSCO Opp. at 13.] Further, NASSCO attempts to distinguish *Roman Catholic Diocese* on grounds that it

involved a materially different statutory scheme. [*Id.* at 13-14.] Despite NASSCO's objection, the Court finds *Roman Catholic Diocese* persuasive. While there are differences in the statutory scheme, the Longshore Act was patterned after N.Y. Workers' Comp. Law § 15, the statute at issue in *Roman Catholic Diocese*.[6]

Like *Roman Catholic Diocese*, the Court finds that the assessments imposed upon NASSCO as a self-insurer cannot reasonably fall within a fair reading of the Policy. The assessments are not amounts that NASSCO must pay to a specific employee for a specific injury that occurred during the policy period. The assessments are expenses imposed on NASSCO as a self-insurer under the Longshore Act. While it may be mathematically possible to determine what portion of the yearly assessment is attributable to Fonce and Pagano, this is largely irrelevant to the question of whether the Policy covers yearly assessments.

Moreover, NASSCO's argument that assessments should be covered by the Policy because they are determined based on injuries sustained by its employees is undermined by the fact that this was also true of the assessment formula when the Policy was entered into in 1976. Indeed, from 1972 until 1984, the yearly assessment was, in part, "calculated based upon [an employer's] share of direct indemnity and medical payments paid in the prior year . . . ." Warns & Feinhalter, *Partial Relief From Liability Under Section 8(f) of the Longshore Act*, 11 Loy. Mar. L.J. 83, 90 (Fall 2012). Thus, while the assessment formula did not seek to determine how many employees an employer had in the Special Fund, it still was based in part on the total disability-related payments made by an employer to its employees.

Yet, NASSCO effectively concedes that the Policy *did not* cover Special Fund assessments at its origination. Indeed, NASSCO does not seek to re-coup pre-1984 assessments, only those following the 1984 formula change. [*See* NASSCO Mot. at

---

[6] Stuart Housel Smith, *The Special Fund Under The Longshore And Harbor Workers' Compensation Act*, 11 Mar. Law. 71, 74 (1986).

11-12 ("The cornerstone of NASSCO's insurance claim is the correlation established by the 1984 formula between the amount of Special Fund benefits that are paid to Pagano and Fonce in any given year, and NASSCO's Special Fund assessment for the following year.").[7] Thus, if assessments pre-1984 are understood by the parties to not be covered by the Policy, it stands to reason that assessments post-1984 would likewise not be covered. The fact that the new formula increased NASSCO's assessment and made it possible to categorize the assessments into individual workers' accounts cannot unilaterally create a new line of coverage under the Policy.

NASSCO asserts that "[f]or liability purposes, it makes no difference that the insured is sought to be held liable under a law enacted after expiration of the insurance policy, as long as such liability is based on facts occurring during the policy period." [NASSCO Reply at 7 (citing Croskey et al., *Cal. Practice Guide: Insurance Litigation*, ¶ 7:2037 (The Rutter Group 2012)).] Applying this principle here is not appropriate. Special Fund assessments were already required in 1976, and the parties' original intent, as described above, was to exclude the assessments from coverage. The 1984 amendments only created a new formula for determining Special Fund assessments–it did not create a new form of liability or enlarge pre-existing avenues of workers' compensation liability.

In sum, the Court concludes that yearly assessments paid into the Longshore Act's Special Fund do not fall within the literal and unambiguous terms of the Policy.

### C. Statute of Limitations

Finally, Century argues that NASSCO's claim for indemnity is barred by the applicable statute of limitations period. California Code of Civil Procedure § 337 provides, in relevant part, that "[a]n action upon any contract, obligation or liability founded upon an instrument in writing" must be commenced within four years. Cal.

---

[7] Additionally, NASSCO failed to request payment of special assessments until 2009—24 years after it asserts Century became obligated to pay for the assessments.

Code Civ. Pro. §§ 335, 337(1).

NASSCO contends that the limitations period has not run, because "[u]nder California law, a breach of contract claim against an insurer accrues upon the 'unconditional denial' of an insured's claim. [NASSCO Opp. at 16 (citing Croskey et al., *Cal. Practice Guide: Insurance Litigation* (The Rutter Group 2012) ¶ 12:1143).] An unconditional denial of NASSCO's claims did not occur until April 2009, and NASSCO brought suit just over three years later, in May 2012. Thus, NASSCO argues its claims are timely.

However, NASSCO misconstrues California law with respect to accrual of the limitations period. "The statute of limitations commences when a party knows or should know the facts essential to the claim." *Love v. Fire Insurance Exchange*, 221 Cal. App. 3d 1136, 1143 (Cal. Ct. App. 1990). An "insured's cause of action accrues *at the latest* upon the date of unconditional denial . . . ." *State Farm Fire & Casualty Co. v. Superior Court*, 210 Cal. App. 3d 604 (Cal. Ct. App. 1989) (citing *Neff v. New York Life Ins. Co.*, 30 Cal.2d 165, 170, 172 (1947)) (emphasis added).

Applied here, NASSCO's cause of action against Century began to accrue when the accounts of Pagano and Fonce, respectively, exceeded the self-insured retention amount of $250,000. According to NASSCO's exhibits, the $250,000 limit with respect to both Pagano and Fonce was reached in 2002. [*See* NASSCO Mot., Ex. H (demonstrating that the total of direct payments and increased special fund assessments related to Pagano equaled $250,219.77 in 2002); Ex. M (total related to Fonce equaled $257,150.83 in 2002).] Thus, the statute of limitations on these claims began to accrue in 2002, when NASSCO could have sought indemnification from Century under the theories espoused here. Consequently, the four-year limitations period expired in 2006. Because NASSCO did not file the present action until 2012, its claims are barred.

///

///

## CONCLUSION

For the reasons set forth above, the Court **DENIES** NASSCO's motion for partial summary judgment and **GRANTS** Century's motion for summary judgment. Because there is no coverage for NASSCO's payment of Special Fund assessments, all of NASSCO's causes of action necessarily fail.

The Clerk of Court is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED**.

DATED: August 2, 2013

Hon. Michael M. Anello
United States District Judge